**COMMUNITY TELEVISION OF UTAH, INC., a Nevada corporation, Plaintiff,**

v.

**ROY CITY, a Utah municipal corporation, Defendant.**

**Ralph McCLEARY, Kay Ulrich and Wayne Williams, Plaintiffs,**

v.

**ROY CITY, a Utah municipal corporation, Defendant.**

Civ. Nos. NC 82–0122J, NC 82–0171J.

United States District Court, D. Utah, N.D.

Dec. 22, 1982.

Bryan L. McDougal, Patricia Metzger, Salt Lake City, Utah, for plaintiffs.

Roger S. Dutson, Roy, Utah, for defendant.

Alan L. Sullivan, Salt Lake City, Utah, for amicus curiae.

## MEMORANDUM OPINION

JENKINS, District Judge.

Plaintiff, Community Television of Utah (Community), brought this action against the City of Roy asserting that an amendment to the Roy City Ordinance[1] directed at the content of cable television transmissions was overly broad, facially defective and unconstitutional.

Plaintiffs, McCleary, Ulrich and Williams, receivers over cable of electronic signals distributed by Community, filed a separate action asserting that the Roy City Ordinance was, as to them, facially defective, overly broad and unconstitutional.

The actions were consolidated. The cases came on for hearing on plaintiffs' motion for summary judgment on December 8, 1982. Appearances were as follows: Bryan McDougal, Esq. and Robert D. Sherlock, Esq. for plaintiff Community Television of Utah; Patricia Metzger, Esq. for plaintiffs McCleary, Ulrich and Williams; and Roger Dutson, Esq. for defendant, Roy City. Alan L. Sullivan, Esq. was present on behalf of Amicus Curiae, Communications Investment Corporation.

These cases, as consolidated, are concerned with a variation on a theme previously examined in depth by this Court in *Home Box Office v. Wilkinson.*[2] Here, as there, we are not dealing with pornography. Pornography is proscribed in Utah.[3] This Court has passed upon that prohibition with full deference to the determinations of the Utah Supreme Court.[4] The first amendment does not protect pornographic communication[5] and none of the parties to these actions asserts that it does.[6]

The question for decision here is more finely honed than that: Does a municipality

---

1. Set forth in full in Appendix A, annexed hereto.

2. *Home Box Office, Inc., et al. v. Wilkinson, Attorney General of the State of Utah, et al.* 531 F.Supp. 987 (D.Utah 1982). Many of the positions asserted here by defendant Roy—abstention, for example—were dealt with in detail in *HBO v. Wilkinson.* Neither the State of Utah nor the City of Roy (it being a member of the affected class) appealed the *HBO* decision.

3. *Utah Code Ann.* § 76–10–1201 *et seq.* (1953). *See State v. Haig,* 578 P.2d 837 (Utah 1978); *State v. Piepenburg,* 602 P.2d 702 (Utah 1979).

4. *Piepenburg v. Cutler,* 507 F.Supp. 1105 (D.Utah 1980) *aff'd* 649 F.2d 783 (10th Cir. 1981).

5. *E.g., Miller v. California,* 413 U.S. 15, 23, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973); *Kois v. Wisconsin,* 408 U.S. 229, 230, 92 S.Ct. 2245, 2246, 33 L.Ed.2d 312 (1972); *United States v. Reidel,* 402 U.S. 351, 354, 91 S.Ct. 1410, 1411, 28 L.Ed.2d 813 (1971); *Roth v. United States,* 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957).

6. This is not *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). We are here concerned with restrictions on electronic transmissions not how one may treat that which has been received after it has been received—a subtle but important distinction.

(Roy) have the power to restrict the right of a cable television distributor (Community) to send, and the right of cable television signal distributees (McCleary, Ulrich, and Williams) to receive, electronic signals convertible to sounds and pictures which are not pornographic, but which, by municipal ordinance definition, may be deemed "indecent," where the distributor of such signals has been granted, pre-ordinance, a franchise and a business license by the city, and where the signals are carried over private wires that are in part built upon and cross over publicly owned property?

Roy suggests that the power to restrict is found in a power to improve morals,[7] a concern for children who may hear and see things they should not,[8] its power to control its streets,[9] and its power to franchise and license.[10] In support of its position, Roy cites and principally relies on the case of *F.C.C. v. Pacifica Foundation* and the rationale found therein.[11]

Plaintiffs in each of the consolidated cases assert that whatever power the city may have is subject to the limitation of the first amendment.[12] They argue that the effort of Roy City to control wire-transmitted content goes beyond the first amendment boundary set forth in *Miller v. California*[13] and applied in *HBO v. Wilkinson*[14] and thus, that the ordinance as amended is overly broad and facially defective. Plaintiffs further assert that *Pacifica* is inapplicable.

In 1973, a radio station owned by the Pacifica Foundation operating in New York City broadcast a monologue by George Carlin which used words that a listener found offensive when he tuned in to the station in the early afternoon while accompanied by a child. He complained to the F.C.C. As a result, a declaratory order verifying the complaint was placed in the F.C.C. file relating to Pacifica Foundation and was available for subsequent use in periodic license renewal hearings. One of the common areas of F.C.C. inquiry during those renewal hearings is whether the radio station has been operating in the "public interest." A majority of the Supreme Court found the action was within the power of the F.C.C., determining that on public airwaves a listener ought not to be surprised and intruded upon by uninvited, patently offensive language.[15] The key concepts in *Pacifica* were the broadcasting of patently offensive material, its presence on public airwaves at a time when it could be available to children, audience surprise, and the power of the F.C.C. to control airwaves in the "public interest."

Roy City analogizes its regulatory power to that of the F.C.C., the sending of electronic signals through wires to the broad-

7. *Utah Code Ann.* §§ 10–8–4, 8, 41, & 80 (1973); Utah Const. art. XI, § 5.

8. Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment at 13, *Community Television of Utah, et al. v. Roy City,* Nos. NC 82–0122J and NC 82–0171J (D.Utah filed Aug. 26, 1982).
   Roy asserts its interest in preserving children of tender years from hearing and seeing things they should not. It is of moment to note the ordinance as written nowhere speaks of children. There are homes in Roy I am sure that currently have no children. It seems inappropriate to restrict communication content to that which is only fit for the eyes and ears of children.

9. *Utah Code Ann.* §§ 10–8–8 & 10–8–11 (1973).

10. *Utah Code Ann.* § 10–8–4 (1973).

11. *F.C.C. v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978).

12. The complete text of the first amendment reads:
    Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. U.S. Const. amend. I. Made applicable to states and subdivisions by Due Process clause of the Fourteenth Amendment.

13. *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

14. *Home Box Office, Inc. et al. v. Wilkinson, Attorney General of the State of Utah, et al.,* 531 F.Supp. 987 (D.Utah 1982).

15. *F.C.C. v. Pacifica,* 438 U.S. at 748–51, 98 S.Ct. at 3039–41.

casting of signals through air, the widespread use of cable service within its community to pervasiveness, and the charge of Roy City to improve the morals of its residents to the protection of the "public interest."

This Court can well understand the concern of the Roy City Council about the deleterious effects on viewers of trash on T.V. This Court has commented on that subject on other occasions without distinguishing between cable and broadcast trash.[16]

The characteristics of cable and broadcast television are dissimilar in several important respects.

| Cable | Broadcast |
|---|---|
| 1. User needs to subscribe. | User need not subscribe. |
| 2. User holds power to cancel subscriptions. | User holds no power to cancel. May complain to F.C.C., station, network, or sponsor. |
| 3. Limited advertising. | Extensive advertising. |
| 4. Transmittal through wires. | Transmittal through public airwaves. |
| 5. User receives signal on private cable. | User appropriates signal from the public airwaves. |
| 6. User pays a fee. | User does not pay a fee. |
| 7. User receives preview of coming attractions. | User receives daily and weekly listing in public press or commercial guides. |
| 8. Distributor or distributee may add services and expanded spectrum of signals or channels and choices. | Neither distributor nor distributee may add services or signals or choices. |
| 9. Wires are privately owned. | Airwaves are not privately owned but are publicly controlled. |

Because of those differences Roy City's reliance on *Pacifica* is misplaced. *Pacifica* applied to broadcasting. The transmission of electronic signals through private wires is not "broadcasting." The F.C.C. no longer asserts transmission by cable to be broadcasting.[17] The Court of Appeals of the District of Columbia does not consider transmission by cable to be broadcasting.[18] *Webster's* does not include it in its definition of broadcasting. Rather, *Webster's* states, "broadcast ... 3. *Radio & Television. To send out* from a transmitting station (information, lectures, music, messages or pictures) *by* radiotelegraph, radiotelephone, or other *radio transmission,* for an *unlimited number of receiving stations.*"[19] There is some clue to the meaning of broadcasting in the ancient concept of scattering

**16.** *HBO v. Wilkinson,* 531 F.Supp. at 1001.

At least under some definitions a high percentage of what we see on television, I think, could very well be brought under the umbrella of indecency. I think the appeal to violence is indecent. I think the appeal to the lowest level of the intellect is indecent. I think the appeal to instant gratification is indecent. I think appealing to the worst in all of us is indecent. Those who do ought to be ashamed of themselves. But that does not mean that what they do is proscribed. *Id.* Yet who after viewing Jacob Bronowski's "Ascent of Man" or "Nature", or "The Long Search" by Ninian Smart, or after watching Itzhak Perlman, can say what we see and hear is all bad? Quite frankly, we get the attention of the supplier of a product by touching the most important portion of his anatomy—his pocketbook.

**17.** *See,* Order of December 7, 1977, 67 F.C.C.2d 252 (1977).

**18.** *See, Home Box Office, Inc. v. F.C.C.,* 567 F.2d 9 (D.C.Cir.1977), *cert. denied* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

**19.** *Webster's New International Dictionary* 339 (2d ed. 1955).

in all directions, such as scattering or casting seed.[20]

Because of the unlimited availability of the electronic signals broadcast in *Pacifica* the U.S. Supreme Court took pains to rest its affirmation of the F.C.C. determination of inappropriateness on a nuisance concept. Explaining the perimeters of its holding, the *Pacifica* majority stated:

> It is appropriate, in conclusion, to emphasize the narrowness of our holding. This case does not involve a two-way radio conversation between a cabdriver and a dispatcher or a telecast of an Elizabethan comedy. We have not decided that an occasional expletive in either setting would justify a criminal prosecution. *The Commission's decision rested entirely on a nuisance rationale under which context is all-important.* The concept requires consideration of a host of variables. The time of day was emphasized by the Commission. The content of the program in which the language is used will also affect the composition of the audience, and *differences between radio, television, and perhaps closed-circuit transmissions may also be relevant.* As Mr. Justice Sutherland wrote, a "nuisance may be merely a right thing in the wrong place,—like a pig in the parlor instead of the barnyard." *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 368 [47 S.Ct. 114, 71 L.Ed. 303]. We simply hold that when the Commission finds that a pig has entered the parlor, the exercise of its regulatory power does not depend on proof that the pig is obscene.[21]

I can well understand the F.C.C. concept, which found favor with the Supreme Court in *Pacifica,* i.e., that the public airways should not be used for the purpose of surprising inadvertent listeners with the mouthings of an intrusive vulgarian. Such conduct could well be considered by the F.C.C. when license renewal time arrives. There is, however, a distinction between shouting uninvited dirty words to all and sundry on a street corner, or from Mount Vision using radio waves, broadcasting, and speaking over an intercom to one's friend or sending over private wires non-pornographic material on request. To understand that distinction one needs to understand the levels of choice relating to cable-transmitted signals in comparison to those relating to broadcast signals.

Through cable the spectrum of choice is appreciably expanded. Those choices encompass various levels. First, one may choose to subscribe or one may choose not to subscribe to a cable service. That is an individual choice. It results in a private contract between private parties. A similar choice is not available with broadcast television. In addition, the scope of cable services offered and accepted is the subject of choice and contract, i.e., to have Home Box Office or not, or to receive certain sports events or not. Such enlarged choice is not available on broadcast channels. Further, one may cancel the subscription to cable but one may not cancel broadcast television.

These contractual choices occur at levels different than the choices one has once the wire is installed and a service is available. At that point, one may turn the set on or leave the set off, similar to broadcast television. If one turns it on, cable provides a larger number of channel and subject choices than does broadcast. The choices on cable which may be available are in theory almost infinite, but even now are far more in number than the choices available in broadcast television. That broadening of choice is often the reason one subscribes to the cable service.

A listener to broadcast radio or a viewer of broadcast television has a more limited choice. He may turn the set on. He may turn the set off. He may switch the dial. Unlike a cable subscription, one cannot terminate his subscription to a publicly allocated broadcast channel. One may complain, one may boycott, one may choose not to patronize the product of a sponsor, one may choose alternative forms of information—

---

20. *Id.* ("broadcaster").

21. 438 U.S. at 750–51, 98 S.Ct. at 3040–41 (emphasis added).

books, movies, cassettes, but one may not unilaterally cancel his subscription. The levels of choice are different.

The non-subscriber has less to choose from. The public airways are crowded and their available use allocated by the F.C.C. In a sense, the F.C.C. has made the subscription choice for the viewer. Because of the limited number of broadcasters, their use of the publicly controlled airways and their favored economic opportunity in using a limited public resource, broadcasters are charged to act "in the public interest." There is no such public interest charge to a cable distributor and at least in theory, no physical limitation on the number of wires available to carry electronic signals. For all of these reasons, Roy City's attempt to analogize cable to broadcasting fails.

The city as well misapprehends the concept of pervasiveness. Literally it means ever-present.[22] It is in the air, or diffused widely. In that sense broadcasting meets the definition. In that sense, it is pervasive because its medium, the air, is pervasive. Transmission by wire is not.

Transmission from Mount Vision of electromagnetic waves into the ether from which any number of persons may receive and may appropriate a pervasive signal is starkly different from feeding a signal into a discreet and limited system of wires to which access is limited, not automatic, although available. Not everyone with a receiver may appropriate the signal from the wire. For cable one must sign up and hook up and maintain the right to take signals from the wire by periodic payments to the supplier. That relationship of sender and receiver is not "broadcasting." The cable signal is not pervasive in the sense of automatic availability to all. It is not in the air, present everywhere, transcending the walls of a house or a building. Cable signals travel over wires, not in the air. Such signals do not travel except upon request. They are asked for. They are invited.

In short, *Pacifica*, which deals with broadcasting, the transmission of electromagnetic radio waves through the publicly controlled airways, is not applicable in this case. It is irrelevant.

If the *Pacifica* standard is not applicable, then what is? Is cable free from any limitations at all? The *Miller* standard is applicable. It is a national standard with a core of uniformity which allows for a degree of flexibility at a community level.[23] It may be uniformly applied to almost all forms of publicly available communication. Books, magazines, cassettes, periodicals, movies, and cable television are all treated essentially in the same fashion regardless of numbers.

In contrast, if one were to accept defendant's reading of *Pacifica*, as well as defendant's concept that the number of cable subscribers justifies the application of its more restrictive standard of content control, then it seems to this Court that the application of a constitutional standard is solely dependent on sheer numbers. It seems an odd

---

**22.** *See,* Webster's New International Dictionary 183 (2d ed. 1955).

**23.** In *Miller* the United States Supreme Court established a three-prong standard under which to evaluate the permissible regulation of communication. The *Miller* Court found that:

> The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest ... (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

438 U.S. at 24, 93 S.Ct. at 2614 (citations omitted).

The *Miller* test requires the application of the average person standard. The ordinance does not. The *Miller* test requires that contemporary community standards be applied. The ordinance requires that Roy standards be applied. The *Miller* standard requires the material to be taken as a whole. The Roy ordinance does not. The *Miller* standard requires an appeal to the prurient interest. The Roy ordinance talks of arousing sexual interest. *Miller* requires that the material, taken as a whole, lacks serious literary, artistic, political or scientific value. The Roy ordinance does not.

criterion. If numbers trigger application or not, the application of the Roy Standard or of the *Miller* Standard would depend on how many people subscribe to cable television. The irresistible analogy compels one to ask why the more restrictive standard should not then apply to large circulation newspapers, or magazines, popular motion pictures and plays, "top ten" musical recordings or even best-selling books. It seems an irony of striking strangeness that the growing popularity of a work of art or authorship would in some fashion enlarge the power of government to restrict or suppress its content.

Nothing in *Miller v. California* even hints that its carefully crafted standards are not to measure the content of even the obscure, the neglected, or the ignored. Even the F.C.C.'s power under *Pacifica* to regulate broadcast radio does not rise or fall based upon a given station's share of the listening audience.

Levels and degrees of choice, not just popularity or circulation, are the significant distinguishments.

*Miller* is not footed on numbers. To the contrary. In applying the *Miller* pornographic standard, one does not say something is dirty or patently offensive merely because more than fifty, or a hundred, or a thousand, or a million persons receive such communication.

If a communication is dirty, patently offensive, or to use defendant's suggested label and standard, "indecent," it seems to me that one transmission and one receiver ought to be enough to trigger application.

There is no virtue in defendant's numbers standards—at least in the context of this case.

Further, there is a serious question raised in the singling out by Roy of one form of communication from all others for special treatment. It poses questions of evenhandedness, equality before the law, and equal protection.[24] The Court finds great difficulty in distinguishing (other than the popcorn) between going to the movies at a theater and having the movies come to me in my home through electronic transmission over wire. The choice is mine. The location is different. The content is the same. Why should the non-"indecent" on Main Street be transmuted by ordinance and municipal definition into "indecency" in my home? That does not make sense if we are talking about a standard to be applied uniformly. There is no distinction made with the *Miller* standard as to whether one goes to the movies or prefers to have the movies come into one's home. The *Miller* standard provides an expansive boundary at the limit of community tolerance.

Why must a community tolerate? Because the first amendment, as interpreted by the High Court of this land, says so. The first amendment is the barrier that precludes others from taking from us what we cannot give away. There are areas of personal freedom that are so important they are inalienable. They belong not to the government but to the people. The first amendment shields us from governmental excesses, no matter who occupies governmental offices.

The kinds of restrictions attempted by Roy are not a fit subject for group or

---

**24.** The fourteenth amendment of the United States Constitution provides, in part:

Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; *nor deny to any person within its jurisdiction the equal protection of the laws.*

U.S. Const. amend. XIV (emphasis added).
*See, e.g., Anderson v. Celebrezze,* 499 F.Supp. 121 (D.C.Ohio 1980); *Vandermark v. Housing Authority of City of York,* 492 F.Supp. 359 (D.C.Pa.1980); *Boothby v. City of Westbrook,* 138 Me. 117, 23 A.2d 316 (1941).

In *Boothby* the Maine Supreme Court stated that "a regulatory ordinance passed [by a city] pursuant to a general legislative grant of power must be reasonable and not arbitrary and operate uniformly on all persons carrying on the same business under the same conditions." 23 A.2d at 319.

governmental choice. The choices are individual, indeed a series of individual choices at various levels of decision-making. One could assert that with individual choice comes individual responsibility to make choices that affirm rather than detract from life. This Court wholeheartedly agrees. But affirmations in this sensitive area of communication may in no sense be compelled by the force of government. They are compelled by the force of self.

Merely calling something pornographic or "indecent" does not make it so. Further, merely calling something indecent does not make it pornographic. In my opinion, the Roy ordinance, as drafted, is an effort, no matter how well intentioned, to control communication that is on the protected side of the pornographic line set forth in *Miller*.[25] That attempt is simply beyond the power of a city, just as it is beyond the power of the state, to accomplish.[26] A limiting construction of the Roy ordinance is unavailable.[27] The words found in §§ 17–3–2(5), 17–3–6(6) and 17–3–8(a)(4) & (c)(4), insofar as they deal with "indecency", are obviously and facially beyond *Miller*. The fairly elaborate procedural safeguards, including the right of appeal to a court of limited jurisdiction,[28] do not salvage the initial deprivation of or the chilling effect on protected communication. Elaborate deprivation is no more comforting than summary deprivation.

Plaintiff (Community) says it is fearful of running movies because of the risk of losing an expensive distribution system if it happens to broadcast an "indecent" movie, as municipally defined. On one occasion, Community shut down its movie channels out of such concern. Counsel for Roy suggests that we need only allow expression of important ideas on cable television, but nowhere is there a suggestion in the written or oral material of what is important. I would suggest that one important idea, the maximization of human freedom, including the freedom to communicate, is very important, both in concept and in action. The poet observed that beauty is in the eye of the beholder,[29] and Martin Luther noted that much is determined by whose ox is gored.[30]

It seems to me that the *Miller* standard, the result of not just years but centuries of dealing with the problem of communication restriction, has some great virtues.[31] It is a national standard with some flexibility on a local level based on community standards. It is applicable to almost all forms of communication. It accommodates a variety of tastes. It does not compel homogeneity and it values diversity.

There is a selfish reason intimately tied to the survival of the diversity of ideas and points of view. We tolerate the ideas of others and the communications which frame those ideas because we want others to tolerate us, our ideas, our points of view. A monolithic social structure tolerant of nothing but approved ideas or points of view is too much akin to the horror of the German Reich. William Shirer, in his famous work, *The Rise and Fall of the Third Reich*, tells of being almost overwhelmed by the sameness of communication in homogenized Germany and his need for the fresh air of freedom.[32]

Diversity also is tolerated because the self-appointed monitor of purified communication may be in error. An American

---

**25.** See, *supra* footnote 23.

**26.** *HBO v. Wilkinson,* 531 F.Supp. 987 (D.Utah 1982).

**27.** In *HBO v. Wilkinson,* this Court recognized that "a state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts." 531 F.Supp. 987, 991 (1982) (quoting *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975)).

**28.** See, appendix A, § 17–3–5.

**29.** M. Hungerford, *Molly Bawn* (1878).

**30.** M. Luther, *Works* 449 (Vol. LXII 1854).

**31.** See Riggs, "Miller v. California" Revisited: An Empirical Note," 1981 B.Y.U.L.Rev. 247 (1981).

**32.** W. Shirer, *The Rise and Fall of the Third Reich,* 248 et seq. (1960).

reviewer of the Walt Whitman classic, *Leaves of Grass,* a book that Ralph Waldo Emerson considered the work of genius,[33] once wrote he would leave "this gathering of muck to the laws which ... must have power to suppress such obscenity." [34] Other works suggested for similar suppression at various locations over the years include: *The New Testament,* translated to English by William Tyndale; [35] *King Lear,* by William Shakespeare; [36] *The Call of the Wild,* by Jack London; [37] and *The Grapes of Wrath,* by John Steinbeck.[38] Even the Mickey Mouse Comic Strip by Walt Disney has not been immune from suppression.[39]

I emphasize again and again and again, public tolerance is not public approval. Nor does such tolerance mean personal approval. But it should be noted that if I subscribe to a magazine, I need not open its cover. I may pick and choose among the articles. If displeased, I may cancel my subscription. The same is true in subscribing to a cable television service. I need not hook up. I need not tune in. I may pick and choose among the programs and I may cancel.

We need not approve, but we tolerate to the line of community standards drawn in *Miller* and applied in *HBO v. Wilkinson.* That public tolerance stems from selfishness as well as from benevolence. We tolerate the distasteful so that we may enjoy the good which may deal with the same subject with sensitivity, compassion, and understanding. The doctrine of overbreadth deals with the danger of legislating away the good when excising what *some* consider to be bad.

Beyond the line drawn in *Miller* public bodies must not step—indeed, cannot step—in the control of artistic communication content. This isn't just what this judge thinks. This is what the law demands, and that law is as binding on this Court as it is on the parties to this lawsuit. In short, neither in the guise of licensing or franchising, nor in the guise of authorizing the use of public property by a private business distributing electronic signals, can a municipality control message content that is not pornographic. One may not do by indirection what one can not do directly.

The first amendment has worked well these 191 years. We need to keep it in good working condition for those who follow.

I now specifically determine for the reasons set forth herein that by this ordinance Roy reaches beyond its powers. The ordinance in question fails because of overbreadth. *See, HBO v. Wilkinson,* 531 F.Supp. 987 (D.Utah 1982). It simply treads in territory which is preserved for the people. In short, individual choice is the right with which we are concerned, the exercise of individual agency. The concomitant factor, of course, is uncompelled, individual responsibility, including the responsibility of a parent to oversee the development of his child. "No police power or censorship power can be a substitute for the moral function of the parent and the family." [40]

Those sections of the Roy ordinance which are directed to "municipally defined indecency" [41] impermissibly restrict the right of distributors to distribute, and of

**33.** *See,* A. Haight, *Banned Books,* 61 (2d ed. 1955); Kouwenhoven, *Biographical Introduction* to W. Whitman, *Leaves of Grass and Selected Prose* at vii–viii (deathbed edition of 1891–2) (1950).

**34.** *See,* Kouwenhoven, *Biographical Introduction* to W. Whitman, *Leaves of Grass and Selected Prose* at vi (deathbed edition of 1891–2) (1950).

**35.** *See,* M. Chase, *The Bible and The Common Reader,* 34–5 (1968).

**36.** *See,* A. Haight, *Banned Books,* 24–5 (2d ed. 1955).

**37.** *Id.* at 83.

**38.** *Id.* at 105.

**39.** *Id.* at 104.

**40.** S. Harris, *The Best of Sydney J. Harris* "Anti-Smut Weapon: A Happy Home" 194 (1976).

**41.** *See,* Appendix A §§ 17–3–2(5); 17–3–6(6); 17–3–8(a)(4) & (c)(4).

receivers to receive, protected communication and thus are constitutionally defective. They are hereby determined to be overly broad, of no force and effect, and the City of Roy should be enjoined from enforcing the provisions thereof. Plaintiffs' motions are GRANTED and defendant's motion to dismiss is DENIED.

Counsel for plaintiffs to prepare and submit an appropriate suggested form of Order not later than December 30, 1982.

This Court appreciates the scholarship and professionalism of counsel.

### JUDGMENT

Pursuant to the memorandum opinion filed herein as well as Rules 56 and 58 Federal Rules of Civil Procedure,

IT IS HEREBY ORDERED AND ADJUDGED:

1. The Court has subject matter jurisdiction of these consolidated cases pursuant to 28 U.S.C. §§ 1331 and 1343. Venue is appropriate under 28 U.S.C. § 1391 since the claims arose in the District of Utah and the party Defendant is a Utah municipal corporation.

2. There is no genuine issue as to any material fact and Plaintiffs are entitled to judgment as a matter of law.

3. Sections 17–3–2(5), 17–3–6(6) and 17–3–8(a)(4) and (c)(4) of the Roy City Ordinances, insofar as they deal with the distribution of "indecent material" (as defined therein), are hereby declared to be violative of the First and Fourteenth Amendments to the United States Constitution.

4. Defendant's motion to stay or dismiss is denied.

5. Defendant is permanently enjoined from enforcing sections 17–3–2(5), 17–3–6(6) and 17–3–8(a)(4) and (c)(4) of the Roy City Ordinances, insofar as they deal with the distribution of "indecent material" (as defined therein), and from taking any other or further action to restrict the right of a cable television distributor to send, or the right of cable television distributees to receive, electronic signals convertible to sounds and pictures which are not pornographic.

6. Costs are awarded to Plaintiffs.

7. This Court reserves judgment on Plaintiffs' claims for attorneys fees and shall set such matters down for consideration at a later date on appropriate application.

### Appendix "A"

**ROY CITY ORDINANCE, TITLE 17 LICENSES**

#### Chapter 3

#### Revocation of Licenses

17–3–1. License Issued Subject to Revocation or Imposition of Other Sanctions

17–3–2. Revocation or Imposition of Other Sanctions Provisions

17–3–3. Procedures and Hearings

17–3–4. Action of City Council

17–3–5. Appeals

17–3–6. Definitions

17–3–7. Failure to Appear

17–3–8. Emergency or Summary Revocation

17–3–9. Alternative Remedies Not Modified

17–3–10. No Refund or Rebate

17–3–11. Failure to Appear

17–3–12. Offense

17–3–13. Severability Clause

**17–3–1. License Issued Subject to Revocation or Imposition of Other Sanctions**

All licenses or franchise permits to operate in Roy City which have been issued or which may hereafter be issued by the City of Roy shall be subject to revocation or imposition of other sanctions as hereinafter provided, without regard to any expiration date thereon.

**17–3–2. Revocation or Imposition of Other Sanctions Provisions**

Business licenses, franchise agreements or other permits to engage in business in Roy City may be revoked or other sanctions imposed for any or several of the following reasons which are hereby declared as being detrimental to the public welfare and interest of Roy City:

(1) Failure to comply with substantial material requirements of the ordinances relating to business licenses or franchises;

(2) Violates any Roy City Zoning Code or Uniform Building Code or codes of professional ethics for licensee's particular profession;

(3) Commits a crime involving moral turpitude or violates criminal laws relating to distribution of pornography;

(4) Practice of any fraud or deceit upon the City, business associates, customers or subscribers;

(5) * *Knowingly distributes any pornographic or indecent material as defined by law and in violation of the community standards of the community encompassed within the territorial area included within the Roy City boundaries;*

(6) Becomes insolvent, unable or unwilling to pay its debts or is adjudged bankrupt;

(7) Substantial material default in performance of any contracts or obligations with the City, citizens of Roy City, customers or subscribers;

(8) Determination by any court of competent jurisdiction or federal regulatory agency or state regulatory agency that any material provision of any franchise agreement is invalid or unenforceable that would materially affect the ability of either party to comply with that agreement or any determination by such body that a business is not lawfully operating within Roy City;

(9) Violation of any lawful orders, rulings, or terms of probation of any regulatory body having jurisdiction over the grantee or licensee relating to their business operations within Roy City which substantially adversely affects the City, citizens of Roy City, business associates, customers or subscribers.

17–3–3. Procedures and Hearings.

1. At any time the Mayor or City Manager determines there are reasonable grounds to believe a licensee or franchisee has engaged in conduct which is grounds for revoking the privilege or right to do business or imposition of other sanctions and the public interest will be best served by such action as provided in this chapter, said Mayor or City Manager may cause said matter to be heard by the City Council by sending a notice to that business directing them to appear before the City Council at a definite date and hour to be stated in such notice directing or allowing said business to show cause, if any it has, why revocation of the business privilege or imposition of other sanctions should not occur. Said notice shall state the provision or provisions of this title allegedly violated, and reason for the proposed revocation, a brief summary of the facts relating to the violation and the fact that the business may be subject to revocation of the business privilege or imposition of other sanctions.

2. There shall be at least five days' written notice given prior to any such hearings and notice shall be given by actual delivery of written notice or depositing said written notice in the United States Mail to said licensee or franchisee at the address given on their license application or franchise agreement or to any subsequent address which has been given to the City Recorder for notices by such licensee, regular mail, postage prepaid. Mailed notice shall be mailed at least ten days prior to the date of hearing.

3. At the hour and date stated in such notice, the licensee or franchisee shall have an opportunity to appear before the City Council and show cause why the business privilege should not be revoked and cancelled, or other sanctions imposed, and may appear in person or by counsel; and the City Council shall thereupon proceed to hear all persons interested in said matter and determine whether or not there has been a violation of any or several of the prohibited acts and whether or not the public welfare will best be served by revocation of the right to do business or imposition of other sanctions. In determining whether or not the public welfare will best be served

* Challenged Provisions.

by revocation or imposition of other sanctions the Council shall consider the following factors in conjunction with all other relevant evidence:

(a) The severity of adverse impact of the prohibited conduct upon the community as a whole. This shall include a consideration of economic, social, health, safety and general welfare impact.

(b) The severity of the adverse impact on any individuals. This shall include a consideration of economic, social, health, safety and general welfare impact.

(c) The impact revocation or imposition of other sanctions would have on the business and alternatives that would be available to prevent future violations.

4. In the event of a hearing for a franchisee pursuant to a written agreement, the City Council shall consider all of the provisions of the agreement, as well as the provisions of this section, prior to determining whether or not the right to operate a business in Roy City should be terminated or other sanctions imposed. In the event of a hearing relating to broadcasting or distributing any pornographic, obscene or indecent material, it shall not be necessary that there be a criminal conviction for same before the City Council reaches its determination relating thereto.

17–3–4. Action of City Council

The City Council may revoke the business license or impose other sanctions provided herein as it determines will best serve the public welfare and interest after it has considered all of the evidence presented at the administrative hearing required by this chapter. Council action may include one or several of the following:

(1) Revocation of the business license or franchise agreement.

(2) Temporary suspension of the business license or business privilege under a franchise agreement for a specific and definite term. The Council may impose conditions on reinstatement after the suspension period.

(3) Order of Probation Which Shall be for a Specific and Definite Term. An order of probation shall advise the business that (a) the business is on probation; (b) the term of probation; (c) the reasons for the probation; (d) the conditions of probation; and (e) what will occur in the event of a violation of the terms or conditions of probation.

(4) Letter of reprimand. This shall set forth the conduct for which the reprimand is being given.

(5) Such other less severe action as the City Council deems appropriate.

The City Council may determine based upon the evidence there is no violation and no cause for any action against the business by the City. The decision and action approved by the City Council shall be issued in writing to the business and in the event of a revocation or suspension, the right to continue to operate a business in Roy City shall thereupon be terminated pursuant to the terms of the written decision of the Council.

In the event of any adverse decision to a business by the Council, the notice of same shall include a statement of the right to appeal any such action as provided herein.

17–3–5. Appeals

In the event the licensee or franchisee desires, they shall have an absolute right of appeal to the Circuit Court, Roy Department, by filing a written notice of appeal of the City Council action within 30 days from the date of the decision by the Roy City Council. The appeal shall be heard as other matters are heard before said court. The issue on appeal shall be whether or not the licensee or franchisee violated any of the specified grounds for revocation or imposition of other sanctions. In addition, the judge without the intervention of a jury may determine whether or not the City Council has acted in an arbitrary and capricious manner towards any business, franchisee or individual in the City Council action, and if so, may set aside the action.

Except as specifically provided otherwise herein, and as provided by general law, all legal actions involving controversies or disputes or which involve the construction of any provision of this law shall be resolved pursuant to Utah State law and through the Utah State judicial system. In addition, any aggrieved party shall first fully

exhaust their administrative remedies prior to filing legal action.

17–3–6. Definitions.

The following definitions shall apply to any revocation hearing alleging distribution or display of pornographic or indecent material:

(1) * *"Community standards" shall mean the standards of the community encompassed within the territorial area covered by the Roy City boundaries.*

(2) * *"Material" means any visual material shown on a cable television system, whether or not accompanied by a sound track or any sound recording played on a cable television system.*

(3) * *"Distribute" shall mean send, transmit or retransmit or otherwise pass through a cable television system.*

(4) "Knowingly" means an awareness, whether actual or constructive, of the character of material or of a performance. A person has constructive knowledge if a reasonable inspection or observation under the circumstances would have disclosed the nature of the subject matter and if a failure to inspect or observe is either for the purpose of avoiding the disclosure or is criminally negligent.

(5) "Pornographic Material" shall mean any material that if the average person, applying contemporary community standards, finds that, taken as a whole, it appeals to prurient interest in sex; it is patently offensive in the description or depiction of nudity, sexual conduct, sexual excitement, sado-masochistic abuse, or excretion; and taken as a whole it does not have serious literary, artistic, political or scientific value.

(6) * *"Indecent Material" shall mean material which is a representation or verbal description of:*

(a) *An erotic human sexual or excretory organ or function; or*

(b) *Erotic nudity; or*

(c) *Erotic ultimate sexual acts, normal or perverted, actual or simulated; or*

(d) *Erotic masturbation;*

*which under contemporary community standards is patently offensive.*

(7) *"Erotic" shall mean tending to arouse sexual feelings or desires.*

17–3–7. Failure to Appear.

In the event that the licensee or franchisee shall fail, neglect or refuse to appear at the hour and date set for such hearing, the Council may proceed to determine the matter in the absence of the licensee or franchisee or may, in its sole discretion, continue the date of such hearing to some later date, and at said later date proceed to act on the matter without further notice to the licensee or franchisee.

17–3–8. Emergency or Summary Revocation.

(a) In addition to being subject to revocation in a manner similar to all other businesses, the business licenses for (1) fireworks sales, (2) auction business without a fixed place of business, (3) fair, circus or carnival and (4) peddler, solicitor or vendor may be summarily revoked by the Mayor or City Manager for any of the following reasons:

(1) Reasonable grounds to believe that the licensee has violated the Roy City Ordinances relating to application, qualifications, and the obtaining of the business license, or

(2) Upon reasonable grounds to believe that the licensee has committed any crime involving moral turpitude, or

(3) The licensee has engaged in any conduct which immediately endangers the health or safety of persons or protection of property within Roy City, or

(4) * *Distribution or display of pornographic or indecent material.*

(b) In the event the Mayor or City Manager revokes any business license under the foregoing provisions, they shall provide a written notice of same to the licensee or the location of the business or such other notice as can reasonably be expected will be received by the licensee and thereupon, the licensee shall immediately cease engaging in business in Roy City.

(c) Any licensee who has had a summary revocation notice given shall be entitled to a hearing before an appeals board consisting

of any three City Council members. The purpose of the hearing shall be to determine whether or not the basis for the revocation is factually supported. This hearing shall be held anytime during the next regular working day after receipt of a written request for said hearing from the licensee. The time and location for the hearing shall be determined by the City Manager or Mayor. The license shall be revoked if the hearing appeals board finds facts which reasonably show the licensee has

   (1) violated the Roy City Ordinances relating to application, qualifications, and the obtaining of the business license, or

   (2) committed any crime involving moral turpitude, or

   (3) engaged in any contact which immediately endangers the health or safety of persons or property within Roy City.

   (4) * *distributed or displayed* pornographic or *indecent material.*

(d) In the event the licensee is not satisfied with the appeal board's findings, it may file written notice of appeal to the City Council as provided for other license revocation hearings. If, after a hearing before the City Council, the license is not revoked under this summary revocation procedure, but it appears there are other grounds for revocation, a license may be revoked for those other reasons without the requirement of notice as in general revocation proceedings.

**17–3–9. Alternative Remedies Not Modified.**

Nothing contained herein shall preclude any other remedy or action pursuant to civil or criminal law.

**17–3–10. No Refund or Rebate.**

In the event of revocation as herein provided, there shall be no refund or rebate of any part of the original license fee paid by the licensee.

**17–3–11. Failure to Appear.**

In the event that the licensee shall fail, neglect or refuse to appear at the hour and date set for such hearing, the Council may proceed to determine the matter in the absence of the licensee, or may, in its sole discretion, continue the date of such hearing to some later date, and at said later date proceed to act on the matter without further notice to the licensee.

**17–3–12. Offense.**

It shall be unlawful for any person to carry on, conduct, or operate any business, trade or profession for which a City license is required after such person's license has been revoked or cancelled in accordance with the provisions of this ordinance; and any person, firm or corporation violating the provisions of this section of this ordinance shall be guilty of a Class "B" Misdemeanor for each day of violation or failure to comply with this section and shall be punished as provided by law.

**17–3–13. Severability Clause.**

If any clause, sentence, paragraph, or part of this ordinance or its application to any person or circumstance shall for any reason be adjudged by any court of competent jurisdiction to be invalid, the judgment shall not affect, impair, or invalidate the remainder of this ordinance or its application to other persons or circumstances but shall be confined in its operation to the clause, sentence, paragraph, persons, or circumstances, or part thereof directly involved in the controversy in which the judgment shall have been rendered. (UCA 76–10–1211)