Ruben CRUZ, Plaintiff,

v.

Maurice A. FERRE, as Mayor and Chairman of the Miami City Commission, etc., et al., Defendants,

and

Miami Cablevision, a joint venture consisting of Americable of Greater Miami, Ltd., etc., et al., Intervenors-Defendants.

HOME BOX OFFICE, INC., etc., Plaintiff,

v.

Maurice A. FERRE, as Mayor and Chairman of the Miami City Commission, etc., et al., Defendants.

No. 83–330–CIV–WMH.

United States District Court, S.D. Florida.

Aug. 2, 1983.

Ellis Rubin Law Offices, P.A., Miami, Fla., for plaintiff Ruben Cruz.

Jose R. Garcia-Pedrosa, City Atty., Miami, Fla., for defendants Ferre, Gary and City of Miami.

Terry S. Bienstock, Miami, Fla., for plaintiff Home Box Office, Inc.

Kenneth M. Meyers, Miami, Fla., for intervenors-defendants Miami Cablevision.

## MEMORANDUM OPINION

HOEVELER, District Judge.

THIS CAUSE came before the Court on motions for summary judgment filed by both sides. After a consideration of the record and the arguments presented by the parties at two hearings, the Court enters the following findings and summary judgment.

The issue presented in this case is whether the Defendant City of Miami may constitutionally regulate the dissemination of material through cable television defined by the City as "indecent." The defendants contend that the pertinent city ordinance, in the procedures it imposes and the material it regulates, is in harmony with the First and Fourteenth Amendments to the United States Constitution. The plaintiffs disagree.

While the Court is sympathetic with the defendants' attempt to protect the perceived deterioration of the "moral fiber" of the City, the ruling in this case must and shall be based upon the Constitution and the Supreme Court interpretations of it. Despite good intentions, however, the means used by the City exceed the limits of proper constitutional action. The City's effort to regulate the distribution through cable television of "indecent" material violates the first amendment guarantee of free speech. Moreover, the methods adopted by the City to enforce the regulation and exclusion of "indecent" and "obscene" materials—permitting the same individual to issue a complaint, judge the merits of that complaint, and impose sanctions for violation of the ordinance—violate the notion of fairness implicit in one's right to due process of law.

Both plaintiffs and defendants have moved for summary judgment. (See Plaintiffs' unchallenged Local Rule 10 J(2) statements). The record as a whole suggests

that there is no genuine issue of material fact, a conclusion certainly nourished by the joint summary judgment motions and the absence of response to the plaintiffs' suggested list of facts about which there was no issue. As a matter of law, the plaintiffs must prevail. Therefore, the plaintiffs' motion for summary judgment is granted. Fed.R.Civ.P. 56. The City shall be permanently enjoined from enforcing these sections of Ordinance No. 9538, Sections 1 and 2(g), which regulate "indecent" material on cable television. The City shall also be permanently enjoined from implementing the procedures and methods by which that ordinance is enforced. These are provided for in Section 3 of the ordinance.

## BACKGROUND

On October 19, 1981, the City of Miami adopted Ordinance No. 9223, effective November 19, 1981. Ordinance No. 9223 ("the cable television ordinance") set forth a comprehensive system for regulating cable television in Miami. On November 19, 1981, pursuant to Ordinance No. 9223, the City enacted Ordinance No. 9332 ("the licensing ordinance"). This ordinance granted Miami Cablevision, Inc. ("Cablevision") a nonexclusive, revocable license to operate a cable television system in Miami. Section 203(a) of the licensing ordinance reiterated a similar provision in the cable television ordinance. It states: "In accepting this license, the licensee acknowledges that its privileges hereunder are subject to the police power of the City ... and the licensee ... agrees to comply with all applicable general laws, resolutions and ordinances presently in force or subsequently enacted by the City pursuant to such power."

On January 13, 1983, the City enacted its third cable ordinance, Ordinance No. 9583, which is the subject of this lawsuit. Ordinance No. 9583 ("the indecency ordinance") provides for the regulation of "indecent" and "obscene" material on cable television. The ordinance states, in pertinent part:

*Section 1.* No person shall by means of a cable television system knowingly distribute by wire or cable any obscene or indecent material.

*Section 2.* The following words have the following meanings:

. . . .

(f) The test of whether or not material is "obscene" is: (i) whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest; (ii) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (iii) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value.

(g) "Indecent material" means material which is a representation or description of a human sexual or excretory organ or function which the average person, applying contemporary community standards, would find to be patently offensive.

The indecency ordinance further provides that all complaints under Section 1 shall be brought before the City Manager, Ord. No. 9538 sec. 3(a), including those initiated by the City Manager. *Id.* The City Manager reviews each complaint to determine whether there is probable cause to believe that a violation of section 1 has occurred. *Id.* sec. 3(b). If he finds probable cause, a hearing is held. *Id.* sec. 3(c). The hearing is to be "informal," but the licensee may be represented by counsel, the parties may present evidence, and the proceedings must be transcribed by a court reporter. *Id.* sec. 3(d)–(e). The licensee is opposed at the hearing by the City, which has the burden of proving that the licensee is in violation of sec. 1. Id. sec. 3(f). The purpose of the hearing is to provide the licensee with an opportunity to refute the alleged violations of the ordinance. The City Manager presides over the hearing, determines the admissibility of evidence, and, within ten days of the hearing's conclusion, must make his finding and decision. *Id.* sec. 3(e), (h). If the City Manager determines that the cable licensee has violated section 1, he may impose sanctions, including suspension or termination of the cable television license. *Id.* sec. 3(h).

The indecency ordinance applies only to cable television. It does not apply to broadcast television, over-the-air microwave transmissions, subscription television services, or movie theaters. All of these forms of transmission are available in Miami, and may have programming generally similar to Cablevision's.

This action for declaratory and injunctive relief was filed on February 9, 1983. Subsequently, HBO intervened as a plaintiff and Cablevision as a defendant. Cablevision's posture at that time was that its contractual obligations justified and even mandated intervention. These contracted obligations included the provision in Cablevision's licensing agreement requiring Cablevision to comply with all present and subsequent laws or ordinances enacted by the City. Ord. No. 9332 sec. 203(a). After being permitted to intervene, Cablevision moved to withdraw, stating that it elected not to take a position in this case. The motion was denied.

### THE CABLE TELEVISION MEDIUM

Unlike broadcast television, which sends over-the-air signals, cable television operates by transmitting programs to subscribers through coaxial cables or wires. These cables or wires are individually attached to ordinary television sets in subscribers' homes. Through the use of a converter, cable television can increase the channel capacity of a television set dramatically. Cablevision, for example, has the capacity to offer up to 104 channels.

Cablevision is presently the sole Miami cable television licensee. It provides basic cable services, which include improved reception of local broadcast television and the reception of more remote broadcast signals. It also has offered and continues to offer subscribers up to six private television services for a separate fee. Subscribers may opt for these services on a monthly basis and must make supplemental payments each month for the services to be maintained.

One private service currently offered by Cablevision is Home Box Office, Inc.

("HBO"). Approximately seventy-five percent of the 2,000 or so Miami households receiving cable television subscribe to HBO. HBO's programming includes feature films, sporting events, and special programs, and is provided 24 hours a day, seven days a week. By agreement, Cablevision retransmits HBO's entire viewing daily.

HBO shows films rated "G," "PG," or "R" by the Motion Picture Association of America, as well as unrated films which would have received such ratings if rated. It is HBO's policy not to exhibit films receiving an "X" rating or its equivalent.

Monthly HBO program guides list the times and dates of all program offerings, and they describe and give the ratings, if any, of the programs. Subscriber-households may control family access to the cable system by using "lockboxes" and "parental keys." These are available from Cablevision free of charge.

### CASE OR CONTROVERSY

For the Court to properly exercise jurisdiction in this matter, there must be a genuine dispute ripe for judicial resolution, i.e., a "case" or "controversy". U.S. Const. art. III; *See also Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941); *International Society for Krishna Consciousness v. Eaves,* 601 F.2d 809, 819 (5th Cir.1979).

A case or controversy exists when there is "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co.,* 312 U.S. at 273, 61 S.Ct. at 512, 85 L.Ed. at 829. In this action, the challenged ordinance has not yet been enforced. That fact, however, is neither dispositive of nor material to the "ripeness" inquiry. *High Ol' Times, Inc. v. Busbee,* 621 F.2d 135, 139 (5th Cir.1980); *American Booksellers Association v. McAuliffe,* 533 F.Supp. 50, 54–55 (N.D.Ga.1981). What is relevant, rather, is the threat of enforcement of the ordinance and the likely inhibition of the exercise of free speech. As

noted in *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418 (1963), "The threat of sanctions may deter [free speech] almost as potently as the actual application of sanctions." The threat in this case burdens both the constitutionally protected right of viewers to receive, *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542, 549 (1969), and the right of cable operators to disseminate diversified communications. *Home Box Office v. FCC,* 567 F.2d 9, 48–59 (D.C.1977). The threat, therefore, creates a genuine case or controversy.

## STANDING

Once a controversy is shown to exist, the plaintiffs must also establish "a personal stake in the outcome of the controversy," *Baker v. Carr,* 396 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962), or an "injury in fact."

■ In the first amendment area, the concept of standing has been broadly construed in favor of litigants asserting their free speech rights. *See Broadrick v. Oklahoma,* 413 U.S. 601, 611–13, 93 S.Ct. 2908, 2915–16, 37 L.Ed.2d 830, 839–41 (1973). Litigants may challenge statutes even though their own rights are not violated so long as the existence of a statute may cause others not before the court to refrain from protected speech. *See Broadrick,* 413 U.S. at 612, 93 S.Ct. at 2916, 37 L.Ed.2d at 840.

An anticipatory challenge such as this is permissible "where the allegedly unconstitutional statute interferes with the way the plaintiff would normally conduct his affairs." *International Society for Krishna Consciousness,* 601 F.2d at 819; *American Booksellers Association,* 533 F.Supp. at 55.

■ While plaintiffs' injuries may not be readily apparent, the chilling effect of the indecency ordinance on the exercise of their speech rights is quite real. Plaintiff-subscriber Cruz may forsake his right to receive rather than challenge the authority and power of the City. Plaintiff-distributor HBO may be discouraged from pursuing programs that may be found "indecent" under the ordinance. Moreover, the *in terrorem* effect of the ordinance on Cablevision by itself may burden the free speech rights of the plaintiffs. *See, NAACP v. Button,* 371 U.S. at 433, 83 S.Ct. at 338, 9 L.Ed.2d at 405, *supra.* In sum, whether plaintiffs sit in a Miami household subscribing to Cablevision or behind a desk at HBO headquarters, the potential deterrence of the legitimate exercise of their first amendment rights provides plaintiffs with standing to bring this suit. *See Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125, 135 (1975).

## SUMMARY JUDGMENT

Summary judgment may be granted pursuant to Fed.R.Civ.P. 56 when there are no material facts in dispute, and where the moving party is entitled to prevail as a matter of law.

The parties in this action have filed extensive memoranda and orally argued the issues presented. The facts as they have emerged are not in dispute. The only unresolved question is one of law—whether or not the ordinance is constitutional.

■ The Court recognizes that caution is required when an ordinance is being challenged only on its face and not as applied to particular plaintiffs in certain circumstances. *See Broadrick,* 413 U.S. at 615, 93 S.Ct. at 2917, 37 L.Ed.2d at 842; *Younger v. Harris,* 401 U.S. 37, 52–53, 91 S.Ct. 746, 754–755, 27 L.Ed.2d 669, 680–81 (1971). *HBO v. Wilkinson,* 531 F.Supp. 987, 991 (D.Utah, 1982). The Court is also sensitive to the rule that a statute should not be found invalid by its terms if it is subject to a narrowing construction that would preserve its validity. *Erznoznik v. City of Jacksonville, supra; United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

It is difficult to conceive, however, of any construction, which would save this ordinance from its constitutional infirmities. The Court should not and cannot redraft or engraft on what is put before it. While proper consideration of the ordinance calls

for an effort to save as much as possible, that effort is unrewarding in this instance. Because of the importance of the questions presented here, I will undertake to develop in more detail the basis for what may initially appear to be an unnecessary federal presumption upon municipal matters of concern.

## THE FIRST AMENDMENT

The first amendment states, in pertinent part, "Congress shall make no law ... abridging the freedom of speech ...." The amendment, as applied to the states and subdivisions thereof through the fourteenth amendment, *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), encompasses a group of rights, several of which have been asserted in this action. These include the right to speak, *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); the right to be silent, *West Va. Board of Ed. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628, 1637–40 (1943); the right to distribute materials, *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); and the right to receive information or ideas. *Stanley v. Ga.,* 394 U.S. at 564, 89 S.Ct. at 1247, *supra.*

Speech has long been viewed as a fundamental value in our country. The thinking of Mr. Justice Cardozo reflects this view:

"Of that freedom (speech) one may say that it is the matrix, the indispensible condition, of nearly every other form of freedom.... [A] pervasive recognition of that truth can be traced in our history, political or legal." *Palko v. Conn.,* 302 U.S. 319, 327; 58 S.Ct. 149, 152–53, 82 L.Ed. 288, 293 (1937).

The same high regard for first amendment freedoms led Mr. Justice Brandeis to state:

"Those who won our independence believed that the final end of the State was to make men free to develop their faculties.... They believed that freedom to think as you will and to speak as you think are means indispensible to the discovery and spread of political truth ....

that public discussion is a political duty; and that this should be a fundamental principle of the American Government." *Whitney v. California,* 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095, 1105 (1927) (Brandeis, J., concurring).

Not all communications, however, are protected by the first amendment. Speech which incites imminent lawless action, *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); defamation, *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); fighting words, *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); and obscenity, *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); for example, all lie entirely outside the umbrella of first amendment protection.

Obscenity is unprotected because of its minimal social value and offensiveness to contemporary moral standards. *Roth v. United States, supra.* In recognition of the dangers inherent in regulating any form of expression, *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) the scope of permissible obscenity regulation has been carefully defined. *Id.* at 24–25, 93 S.Ct. at 2614–2616. The current regulatory limit is articulated in *Miller:*

A state offense must also be limited to works which taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political or scientific value. *Id.* at 23–24, 93 S.Ct. at 2614–2615.

Indecent speech, however, does not fall within the confines of the definition of obscenity and is accorded some first amendment protection. *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). Therefore, in regulating the distribution of "indecent" materials, the ordinance sweeps within its bounds "speech" subject to constitutional protection. By transgressing the carefully crafted limits of the Miller "obscenity" test, the ordinance is

overly broad and facially defective. *See Community Television of Utah v. Roy City,* 555 F.Supp. 1164 (D.Utah 1982).

The defendants oppose this analysis and argue that the leading case on the regulation of "indecent" speech, *Pacifica,* supports the ordinance's proscription of "indecent" speech. I quite agree that *Pacifica* is, from defendants standpoint, the most attractive case upon which to shape their argument. However, a careful consideration of *Pacifica* serves defendants position poorly and, indeed, highlights the distinctions which render the case inapplicable to the facts herein.

In *Pacifica,* a twelve-minute monologue by comedian George Carlin was aired by a radio station in mid-afternoon. The monologue was titled "Filthy Words" and contained offensive and vulgar language. An adult listener, whose child inadvertently heard the broadcast, complained to the Federal Communications Commission (FCC). The FCC found the monologue to be "patently offensive"—indecent, but not obscene—and subject to regulation.

The Supreme Court found that even though indecent speech was afforded some constitutional protection, its content could be regulated under some circumstances. In determining whether *Pacifica* was one such circumstance, the Court emphasized that both the content and the context of speech are critical elements of first amendment analysis. *Id.* 438 U.S. at 744, 98 S.Ct. at 3038. Within this framework, the regulation of Carlin's broadcast was held constitutional. The content of the monologue was found to be "vulgar", "offensive" and "shocking." *Id.* 438 U.S. at 747, 98 S.Ct. at 3039, 57 L.Ed.2d at 1092. The context in which the speech occurred was also found to support regulation.

The Court noted that different media forms present different first amendment problems and consequently merit disparate methods of regulation. Broadcasting, by virtue of its pervasiveness, its ability to invade the privacy of the home and the technological scarcity of available frequencies is afforded more limited constitutional protection than other communications media. *Id.* 438 U.S. at 748, 98 S.Ct. at 3039. *See also Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Broadcasting, moreover, is uniquely accessible to children. *Pacifica,* 438 U.S. at 749, 98 S.Ct. at 3040.

The *Pacifica* Court stated that its decision in that case was to be narrowly construed. *Id.* 438 U.S. at 750, 98 S.Ct. at 3041. The Court elaborated on this point, explaining that:

> [C]onsideration of a host of variables (is required): The time of day . . ., the content of the program in which the language is used . . . and differences between radio, television and perhaps closed-circuit transmission. . . . *Id.* at 751, 98 S.Ct. at 3041, 57 L.Ed.2d at 1094 (footnote omitted).

■ The ordinance subject to review by this court prohibits far too broadly the transmission of indecent materials through cable television. The ordinance's prohibition is wholesale, without regard to the time of day or other variables indispensable to the decision in *Pacifica.* The rationale of *Pacifica* applies only to broadcasting. The medium of cable television presents different first amendment concerns; therefore, *Pacifica* is inapposite.

*A comparison of cable and broadcast*

The comparison of the broadcast and cable television media reveals the extent to which *Pacifica* is inapplicable here. In *Community Television of Utah, Inc. v. Roy City, supra,* which involved circumstances identical to the case at bar, the District Court explored some of the many differences between broadcast and cable television.

In *Roy City,* the Court found that a City ordinance regulating the transmission through cable television of material defined as indecent was constitutionally defective because it inhibited protected communication. The Court, in so finding, meticulously charted the dissimilarities of cable and broadcast:

| Cable | Broadcast |
|---|---|
| 1. User needs to subscribe. | User need not subscribe. |
| 2. User holds power to cancel subscriptions. | User holds no power to cancel. May complain to F.C.C. station, network, or sponsor. |
| 3. Limited advertising. | Extensive advertising. |
| 4. Transmittal through wires. | Transmittal through public airways. |
| 5. User receives signal on private cable. | User appropriates signal from the public airwaves. |
| 6. User pays a fee. | User does not pay a fee. |
| 7. User receives preview of coming attractions. | User receives daily and weekly listing in public press or commercial guides. |
| 8. Distributor or distributee may add services and expanded spectrum of signals or channels and choices. | Neither distributor nor distributee may add services or signals or choices. |
| 9. Wires are privately owned. | Airways are publicly controlled. |

*Id.*

In *Home Box Office Inc. v. FCC,* 567 F.2d 9 (D.C.Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977), the Court of Appeals expounded on the first amendment implications of the dissimilarities of cable and broadcast television. *HBO v. FCC* involved the permissible scope of FCC regulation of cable television programming and subscription broadcast television. The Court of Appeals for the District of Columbia held that the restrictions which applied to cable were invalid although they were not necessarily so as applied to subscription broadcast services. The Court stated:

"The First Amendment theory espoused in *National Broadcasting Co.* and reaffirmed in *Red Lion Broadcasting Co.* cannot be directly applied to cable television since an essential precondition of that theory—physical interference and scarcity requiring an umpiring role for government—is absent." *HBO v. FCC,* 567 F.2d at 44–45 (footnote omitted).

Significantly, in addition to offering greater quantitative choice, cable also provides greater overall viewing control to the subscriber. Cable is "offered to users of television sets on terms the users are free to accept or reject." *Id.* at 61 (Weigel, J., concurring). It is totally up to the user to decide to bring Cablevision into his home. *See Stanley v. Georgia, supra.* Viewers of cable television may also avoid the surprise that sometimes occurs in broadcast programming. Cable subscribers need only consult the monthly viewing guides for information. And to protect children or other immature viewers from unsuitable programming, subscribers need only use a free "lockbox" or "parental key" available from Cablevision. This opportunity to completely avoid the potential harm to minor or immature viewers sounds the death-knell of *Pacifica's* applicability in the cable television context.

Having determined that *Pacifica* does not control, this Court finds that *Miller,* which limits the content regulation of speech to obscenity, is apposite:

"... *Miller* establishes the analytical boundary of permissible state involvement in the decision by (cable distributors) to offer, and the decision by subscribers to receive, particular cable programming." *HBO v. Wilkinson,* 531 F.Supp. at 994–95.

The provisions of the ordinance regulating indecent material exceed the strict limits of regulation set forth in *Miller* and are therefore unconstitutional.

## DUE PROCESS OF LAW

Plaintiffs also contend that the methods and procedures which provide for the enforcement of the ordinance violate the fundamental notion of fairness implicit in due process. The Court concurs.

The due process clause of the Fourteenth Amendment provides that a state may not deprive "any person of life, liberty or property without due process of law." The concept of due process protects against arbitrary and capricious governmental action. *See e.g., Ohio Bell Tel. Co. v. Comm'n,* 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937). Due process safeguards attach when a property or liberty interest, defined by a source such as state law, is subject to deprivation. See *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1971). It is undisputed that Cablevision's license is a property interest entitled to some form of due process protection. The issue before the Court, then, is whether the procedural safeguards afforded by the ordinance are constitutionally sufficient.

The defendants contend that the ordinance's mandatory pre-discipline/deprivation hearing satisfies due process requirements by guaranteeing licensees the necessary "meaningful opportunity to be heard." *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113, 119 (1971).

Due process requires, however, not only that certain procedures such as hearings be provided, but also that the procedures which are provided be fair. *In Re: Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955) (involving a situation in which the same individual sat as both judge and grand jury). The opinion in *Murchison* is instructive:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end, no man can be judge in his own case. It would be very strange if our system of law permitted a judge to act as a grand jury and then try the very per-

sons accused as a result of his investigations. Id. 349 U.S. at 136, 75 S.Ct. at 625, 99 L.Ed. at 946.

The defendants point out that the mere combination of investigative and adjudicative functions is not in itself unfair and violative of due process. *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712, 723 (1975). This assertion, while true, is incomplete:

> That the combination of investigative and adjudicative functions does not, without more, constitute a due process violation, does not, of course, preclude a court from determining from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high. *Id.* at 58, 95 S.Ct. at 1470, 43 L.Ed.2d at 730.

This statement is dispositive in this case. The indecency ordinance permits the City Manager to initiate complaints against the licensee, assess the validity of the complaint, preside over the hearing on the complaint, admit evidence at the hearing, make a determination, and issue sanctions, all in an area of moral judgment that might well try the neutrality and impartiality of Solomon. The risk of arbitrary or capricious governmental action under these circumstances is intolerably high. The Court consequently finds that these procedures, by concentrating the functions of complainant, jury, judge and "executioner" in one person, do not comport with the fundamental notion of fairness implicit in due process.

## OTHER CLAIMS

The plaintiffs challenge the ordinance on various other grounds not considered in this opinion. The Court need not and consequently will not review any of these claims.

The plaintiffs' claim that the ordinance violates the equal protection clause of the Fourteenth amendment, however, merits discussion. The claim presents the interesting and difficult question whether a city's regulation of the distribution of certain "indecent" speech through cable television and not other forms of communication deprives

the regulated speakers of equal protection under the law.

■ The standard of judicial review of equal protection claims depends on the invidiousness of the challenged governmental classification. If the governmental classification is based on speech content, strict scrutiny applies. *See Police Department v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Strict scrutiny requires that the government show a compelling interest justifying its actions and the absence of a less restrictive alternative. *See Carey v. Brown*, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980). The relationship between the means used by the government to achieve its goals and the need for such regulation must also be precise. *Id.*

The indecency ordinance applies specifically to transmissions of "indecent" and "obscene" speech and is thus content-based. Therefore, strict scrutiny is appropriate.

In this case, the indecency ordinance omits the necessary relationship between the means used by the City—the prohibition of indecent material on cable television—and the assumed objective of the City—to maintain standards of decency within the City. The impact of indecent material presented by cable television on public morality has not been demonstrated.

■ The ordinance applies only to cable transmissions. It does not apply to other forms of transmission such as over-the-air microwave transmissions, subscription broadcast television, or movie theaters. These media forms legally disseminate within the City material that may be prohibited from cable television under the indecency ordinance. This disparity in treatment is probably not justified under the exacting demands of strict scrutiny.

## CONCLUSION

A somewhat more detailed discussion of the City's undertaking seems appropriate. In so doing, I succumb to the urge to comment on one of the directions of our time, and to make some observations, born, no doubt, of the reality which increasingly surrounds us. From antiquity, the smut peddlers have been with us. Hadrian (AD 76–138) one of the "five good emperors of Rome" wrote in his memoirs "the story-tellers and spinners of erotic tales are hardly more than butchers who hang up for sale morsels of meat attractive to flies." (Memoirs of Hadrian, YOURCONAR, Marguerite; Farrar, Straus and Giroux, N.Y. 1981, p. 22). The butchers of our times press forward, their appetites for profit obscured by the banners of the First Amendment which they thrust forward with each new attempt to enlarge the ambit and prurience of their offerings. The potential for corporate moral enervation does not, of course, present an impediment to entrepreneurs; but general concerns, no doubt, present the background for the City's well meant effort to regulate or eliminate "indecency." While, our collective zeal to stem the tide of smut must always be tempered by ongoing and careful reference to the Constitution, we must, nonetheless, be sympathetic to the thought that in our avid pursuit of the most generous view of "free" speech in this area, we exercise caution. By constitutional indulgence in an area which should be more carefully scrutinized, reactions are born which could ultimately infect the much most important of the First Amendment speech freedoms.

The suggestion that much of what we see today on our newsstands, in some book stores and many screens, has some socially redeeming value, seems born of the vertical exercise of viewing each new incursion into boldness in the light of the one most recently justified. It is difficult to predict where our tolerance of licentiousness will end. The "end," however, cannot be induced by the use of a blunderbuss. The understandable anxieties of the City fathers cannot provide the basis for approving legislation which in its reach exceeds the dangers they contemplate and which they have the power to control. That I am sympathetic with the general objective of the City is unimportant. My course has been charted by the Supreme Court. In *Stanley v. Georgia*, 394

U.S. at 565, 89 S.Ct. at 1248, the Court stated:

> If the first amendment means anything, it means that a State has no business telling a man, sitting alone in his own house what books he may read or what films he may watch.

I do not suggest by reference to *Stanley* that government may have no say about indecent material projected into citizens' living rooms. In some circumstances involving conventional broadcast programming, the *Pacifica* opinion may well be held to apply. It does not apply here.

Passing the question of whether the state has pre-empted regulation of obscenity, no one questions the right of the City to properly legislate in this area. Again, the fatal defects are the broadness of the ordinance and its due process deficiencies.

Finally, a fitting conclusion to this case is a reference to the Supreme Court conclusion in *Erznoznik, supra:*

> "In concluding that this ordinance is invalid, we do not deprecate the legitimate interests asserted by the City of Jacksonville. We hold only that the present ordinance does not satisfy the vigorous constitutional standards that apply when government attempts to regulate expression. Where first amendment freedoms are at stake we have repeatedly emphasized that precision of drafting and clarity of purpose are essential. These prerequisites are absent here."

The defect of overbroadness will not be solved by redrafting. The procedural problems—the precursor to sanctions—can be. In its present form, the ordinance cannot be saved.

Therefore, the motions for summary judgment filed by plaintiffs are granted; the motions for summary judgment filed by defendants are denied. The City of Miami and its employees are permanently enjoined from in any way enforcing the provisions of the ordinance referred to.