**Ruben CRUZ, Plaintiff-Appellee,**

**Home Box Office, Intervenor-Appellee,**

**v.**

**Maurice A. FERRE, etc., Howard Gary, etc., the City of Miami, Fl., etc., Defendants-Appellants,**

**Americable of Greater Miami, Ltd., et al., Intervenors.**

**No. 83–5588.**

United States Court of Appeals, Eleventh Circuit.

March 22, 1985.

---

Gisela Cardonne, Asst. City Atty., Miami, Fla., for defendants-appellants.

Charles A. Hobbs, Hobbs, Straus, Dean & Wilder, Washington, D.C., for amicus curiae, State of Utah.

Ellis Rubin, Miami, Fla., for plaintiff-appellee.

Frates, Bienstock & Sheehe, Terry S. Bienstock, Miami, Fla., Faith Wender, Los Angeles, Cal., George Shapiro, Washington, D.C., for Home Box.

William M. Grodnick, Myers, Kenin, Levinson, Ruffner, Frank & Richards, Miami, Fla., for Miami Cablevision.

Michael R. Klipper, MPAA, Inc., New York City, Tench C. Coxe, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for Motion Picture Assn. of America, Inc., amicus curiae.

Robert St. John Roper, Washington, D.C., for National Cable Television Assn., Inc., amicus curiae.

Before HATCHETT and CLARK, Circuit Judges, and STAFFORD [*], District Judge.

STAFFORD, District Judge:

This cause involves a challenge to the constitutionality of a Miami ordinance regulating the distribution of obscene and indecent material through cable television. The district court found the provisions of the ordinance regulating the distribution of "indecent material" constitutionally overbroad. Additionally, the district judge held that the ordinance "violate[s] the notion of fairness implicit in one's right to due process of law." *Cruz v. Ferre,* 571 F.Supp. 125, 126 (S.D.Fla.1983). We affirm on both first amendment and due process grounds.

FACTS AND PROCEDURAL HISTORY

City of Miami Ordinance No. 9223, adopted on October 19, 1981, sets forth the overall system for regulating cable television in the City of Miami. On November 19, 1981, the city enacted Ordinance No. 9332, granting Miami Cablevision ("Cablevision"), a joint venture of Americable of Greater Miami, Inc., and Miami Telecommunications, Inc., a nonexclusive, revocable license to operate a cable television system in Miami.

On January 13, 1983, the city enacted a third cable ordinance, Ordinance No. 9538. This ordinance, which is the subject of this

---

[*] Honorable William H. Stafford, Jr., Chief U.S. District Judge for the Northern District of Flori- da, sitting by designation.

lawsuit, is intended to regulate "indecent" and "obscene" material on cable television. The relevant portions of this ordinance provide:

> Section 1. No person shall by means of a cable television system knowingly distribute by wire or cable any obscene or indecent material.
>
> Section 2. The following words have the following meanings:
>
> . . . .
>
> (f) The test of whether or not material is "obscene" is: (i) whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest; (ii) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (iii) whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value.
>
> (g) "Indecent material" means material which is a representation or description of a human sexual or excretory organ or function which the average person, applying contemporary community standards, would find to be patently offensive.

Additionally, section 3 of the ordinance provides procedures for complaints alleging violations of the ordinance to be brought. The city manager is to receive all complaints of alleged violations. Ordinance No. 9538, sec. 3(a). Furthermore, the city manager is empowered to initiate such claims himself. Id. All complaints, whether received or initiated by the city manager, are to be reviewed by him to determine whether there is probable cause to believe that a violation has been committed. Id. sec. 3(b). If the city manager determines that such probable cause exists, he must give written notice of the alleged violation to the licensee. The notice must specify the nature of the alleged violation and the date, time, and place of the hearing to be conducted by the city manager. Id. sec. 3(c). At the hearing, which is to be "informal," the licensee may be represented by

counsel and may present evidence and cross-examine witnesses; the proceedings are to be transcribed by a court reporter. Id. sec. 3(d). The city manager presides over the hearing and governs the admissibility of evidence. Id. sec. 3(e). The burden of proof (a preponderance of the evidence) is on the city, which is represented by the city attorney or his designee. Id. sec. 3(f). Within ten days after the conclusion of the hearing, the city manager is to make his written findings and decision, including the nature and extent of any sanctions imposed and the reasons therefore. Id. sec. 3(h). The only sanctions provided in the ordinance are suspension of the license for a period of time not to exceed nine days, or termination of the license. Id. sec. 3(i).

This action for declaratory and injunctive relief was filed in February 1983 against appellants, the City of Miami, its mayor, and its city manager. Plaintiff-appellee Ruben Cruz is a Cablevision subscriber. The complaint sought a judgment declaring the ordinance void on its face and an injunction restraining the enforcement of the ordinance. Appellee Home Box Office, Inc. ("HBO") was permitted to intervene as a plaintiff. Cablevision was granted leave to intervene as a defendant and later moved to withdraw, but its motion was denied. Cablevision did not take a position in the lower court and has not participated in this appeal.

Because the facts of this case were not in substantial dispute, all parties filed motions for summary judgment. Plaintiffs also filed motions for preliminary and permanent injunctions. After holding two hearings on the issues presented, the district judge granted plaintiffs' motions on August 2, 1983. The city was permanently enjoined from enforcing sections 1 and 2(g) of Ordinance No. 9538, which regulate "indecent material" on cable television. The court also enjoined the city from implementing the enforcement procedures provided for in section 3 of the ordinance.

Appellants challenge the district court's resolution of the first amendment and due

process issues.[1] An amicus curiae brief urging reversal has been filed by the State of Utah. Amicus curiae briefs urging affirmance have been filed by the National Cable Television Association, Inc., and the Motion Picture Association of America, Inc.

### FIRST AMENDMENT

The United States Supreme Court has long recognized that the first amendment's prohibition against any "law ... abridging the freedom of speech" applies to the states and their subdivisions through the fourteenth amendment. *Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). The Court has recognized only limited categories of speech that fall outside of the first amendment's protection. The Court has declined to extend protection to fighting words, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); defamation, *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); speech inciting imminent lawless action, *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); and obscenity, *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). In *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the Court reaffirmed that obscene material is unprotected by the first amendment and set forth the current permissible limits of regulation. However, the *Miller* court "acknowledge[d] ... the inherent dangers of undertaking to regulate any form of expression. State statutes designed to regulate obscene materials must be carefully limited." *Id.* at 23–24, 93 S.Ct. at 2614–2615.

Appellees did not challenge the Miami ordinance's definition of "obscene" material or the city's constitutional authority to regulate obscenity on cable television. (The ordinance's definition of obscenity is in fact closely derived from the test set forth in *Miller.*) Rather, appellees challenged the provisions of the ordinance which attempt to regulate "indecent" materials. The ordinance's definition of inde-

cent materials goes beyond the *Miller* definition of obscenity in two significant respects. First, the ordinance does not require that the challenged materials, "taken as a whole, appeal to the prurient interest in sex." *Miller*, 413 U.S. at 24, 93 S.Ct. at 2615. Second, the ordinance does not inquire whether the materials, "taken as a whole, do not have serious literary, artistic, political, or scientific value." *Id.* Therefore, if materials falling within the ordinance's definition of "indecent" are to be regulated, the city's authority to do so must be found somewhere other than in the Supreme Court's obscenity cases.

Appellants' primary argument on appeal is that authority for the city's regulation is found in the Supreme Court decision *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). In *Pacifica*, a radio station broadcast a twelve-minute monologue by comedian George Carlin entitled "Filthy Words." The monologue was replete with language described as "vulgar," "offensive," and "shocking." *Id.* at 747, 98 S.Ct. at 3039. The broadcast was in mid-afternoon, and the complaining listener heard the monologue while traveling in his automobile with his young son. The narrow issue presented to the court was whether the Federal Communications Commission (FCC) had the authority to regulate and proscribe this particular broadcast. *Id.* at 742, 98 S.Ct. at 3036. Five members of the Court concluded that broadcasting of indecency could be regulated by the FCC under certain circumstances. The Court noted that "of all forms of communication, it is broadcasting that has received the most limited First Amendment protection." *Id.* at 748, 98 S.Ct. at 3040. The Court found two factors regarding broadcasting to be of particular relevance to the case with which it was presented. First, the Court found relevance in the fact that "the broadcast media have established a uniquely pervasive presence in the lives of all Americans" and that "[p]atently offensive, indecent material presented over

---

**1.** Appellants do not challenge the district court's findings regarding the existence of a "case or controversy" and standing.

the airwaves confronts the citizen, not only in public, but also in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder." *Id.*[2] Second, the Court found that "broadcasting is uniquely accessible to children, even those too young to read." *Id.* at 749, 98 S.Ct. at 3040. The Court was concerned with "[t]he ease with which children may obtain access to broadcast material," and also recognized "the government's interest in the 'well-being of its youth' and in supporting 'parents' claim to authority in their own household' ...." *Id.* at 749–50, 98 S.Ct. at 3040–41 (quoting *Ginsberg v. New York,* 390 U.S. 629, 639–40, 88 S.Ct. 1274, 1280–81, 20 L.Ed.2d 195 (1968)).

The *Pacifica* Court, however, made a point of "emphasiz[ing] the narrowness of our holding." 438 U.S. at 750, 98 S.Ct. at 3041. The Court suggested that factors such as the time of day of the broadcast, the content of the program, and the compo-

sition of the audience might affect whether a particular broadcast could be regulated. *Id.*[3] Moreover, the Court wrote that "differences between radio, television, and perhaps closed-circuit transmissions, may also be relevant." *Id.*

The district court, after "a careful consideration of *Pacifica,*" found *Pacifica* to be "inapplicable to the facts herein." *Cruz v. Ferre,* 571 F.Supp. at 131. After describing the cable television medium,[4] the district court contrasted the cable medium with broadcast television. A Cablevision subscriber must make the affirmative decision to bring Cablevision into his home. By using monthly program guides, the Cablevision subscriber may avoid the unpleasant surprises that sometimes occur in broadcast programming. Additionally, the district court noted, the ability to protect children is provided through the use of a free "lockbox" or "parental key" available from Cablevision. *Id.* at 132.

---

**2.** Because the broadcast audience is constantly tuning in and out, prior warnings cannot completely protect the listener or viewer from unexpected program content. To say that one may avoid further offense by turning off the radio when he hears indecent language is like saying that the remedy for an assault is to run away after the first blow.
*Pacifica,* 438 U.S. at 748–49, 98 S.Ct. at 3039–40.

**3.** With reference to the Court's opinion, Justice Powell, joined by Justice Blackmun, stated: "On its face, it does not prevent respondent Pacifica Foundation from broadcasting the monologue during late evening hours when fewer children are likely to be in the audience, nor from broadcasting discussions of the contemporary use of language at any time during the day." *Pacifica,* 438 U.S. at 760, 98 S.Ct. at 3046 (Powell, J., concurring).

**4.** Judge Hoeveler gave a brief description of the cable television medium and the nature of subscription services such as HBO:

Unlike broadcast television, which sends over-the-air signals, cable television operates by transmitting programs to subscribers through coaxial cables or wires. These cables or wires are individually attached to ordinary television sets in subscribers' homes. Through the use of a converter, cable television can increase the channel capacity of a television set dramatically. Cablevision, for example, has the capacity to offer up to 104 channels.

Cablevision is presently the sole Miami cable television licensee. It provides basic cable services, which include improved reception of local broadcast television and the reception of more remote broadcast signals. It also has offered and continues to offer subscribers up to six private television services for a separate fee. Subscribers may opt for these services on a monthly basis and must make supplemental payments each month for the services to be maintained.

One private service currently offered by Cablevision is Home Box Office, Inc. ("HBO"). Approximately seventy-five percent of the 2,000 or so Miami households receiving cable television subscribe to HBO. HBO's programming includes feature films, sporting events, and special programs, and is provided 24 hours a day, seven days a week. By agreement, Cablevision retransmits HBO's entire viewing daily.

HBO shows films rated "G," "PG," or "R" by the Motion Picture Association of America, as well as unrated films which would have received such ratings if rated. It is HBO's policy not to exhibit films receiving an "X" rating or its equivalent.

Monthly HBO program guides list the times and dates of all program offerings, and they describe and give the ratings, if any, of the programs. Subscriber-households may control family access to the cable system by using "lockboxes" and "parental keys." These are available from Cablevision free of charge.
*Cruz v. Ferre,* 571 F.Supp. at 128.

In reaching his conclusions, the district judge relied in great part upon two cases from Utah, *Community Television, Inc. v. Roy City*, 555 F.Supp. 1164 (D.Utah 1982), and *Home Box Office, Inc. v. Wilkinson*, 531 F.Supp. 987 (D.Utah 1982). *Roy City* and *Wilkinson* are the only other federal cases to have adjudicated the applicability of *Pacifica* to cable television. The district court in *Roy City* summarized the "key concepts" in *Pacifica* as "the broadcasting of patently offensive material, its presence on public airwaves at a time when it could be available to children, audience surprise, and the power of the F.C.C. to control airwaves in the 'public interest.'" 555 F.Supp. at 1166. After listing the differences between cable and broadcast television, *id.* at 1167,[5] the *Roy City* court examined these differences in greater detail and concluded, based upon these differences, that *Pacifica* is inapplicable to cable television. The court gave particular emphasis to *Pacifica*'s "pervasiveness" component and found that cable television, unlike broadcast television, is not pervasive. *Id.* at 1169.

Although we recognize the complicated and uncertain area of constitutional interpretation which we are entering and the importance of the interests asserted by the city, we are persuaded that *Pacifica* cannot be extended to cover the particular facts of this case. *Pacifica*, it must be remembered, focused upon broadcasting's "pervasive presence," 438 U.S. at 748, 98 S.Ct. at 3040, and the fact that broadcasting "is uniquely accessible to children, even those too young to read." *Id.* at 749, 98 S.Ct. at 3040. The Court's concern with the pervasiveness of the broadcast media can best be seen in its description of broadcasted material as an "intruder" into the privacy of the home. Cablevision, however, does not "intrude" into the home. The Cablevision subscriber must affirmatively elect to have cable service come into his home. Additionally, the subscriber must make the additional affirmative decision whether to purchase any "extra" programming services, such as HBO. The subscriber must make a monthly decision whether to continue to subscribe to cable, and if dissatisfied with the cable service, he may cancel his subscription. The Supreme Court's reference to "a nuisance rationale," *id.* at 750, 98 S.Ct. at 3041, is not applicable to the Cablevision system, where there is no possibility that a non-cable subscriber will be confronted with materials carried only on cable. One of the keys to the very existence of cable television is the fact that cable programming is available only to those who have the cable attached to their television sets.[6]

Probably the more important justification recognized in *Pacifica* for the FCC's authority to regulate the broadcasting of indecent materials was the accessibility of broadcasting to children.[7] "The ease with which children may obtain access to broadcast material ... justif[ies] special treatment of indecent broadcasting." *Id.* at 750, 98 S.Ct. at 3041. This interest, however, is significantly weaker in the context of cable television because parental manageability of cable television greatly exceeds the ability to manage the broadcast media. Again, parents must decide whether to allow Cablevision into the home. Parents decide whether to select supplementary programming services such as HBO. These services publish programming guides which identify programs containing "vulgarity," "nudity," and "violence." Additionally, parents may obtain a "lockbox" or "parental key" device enabling parents to prevent children from gaining access to "objectionable" channels of programming.

---

5. This list was reproduced in the district court's opinion. *Cruz v. Ferre*, 571 F.Supp. at 132.

6. Appellants seem to want to extend Justice Steven's "pig in the parlor" analogy. *See* Brief of Appellants at 16 ("it makes no difference whether the pig enters the parlor through the door of broadcast, cable, or amplified speech: government is entitled to keep the pig out of the parlor"). It seems to us, however, that if an individual voluntarily opens his door and allows a pig into his parlor, he is in less of a position to squeal.

7. Justices Powell and Blackmun seem to have placed particular emphasis upon this justification. *See Pacifica*, 438 U.S. at 757–59, 98 S.Ct. at 3044–46 (Powell, J., concurring).

Cablevision provides these without charge to subscribers.

*Pacifica* represents a careful balancing of the first amendment rights of broadcasters and willing adult listeners [8] against the FCC's interests in protecting children and unwilling adults. The Court held that, under the particular facts of *Pacifica,* the balance weighed in favor of the FCC. Because we determine that under the facts of the instant case the interests of the City of Miami are substantially less strong than those of the FCC in *Pacifica,* we believe that we must hold *Pacifica* to be inapplicable to this case.[9]

Our conclusion regarding the applicability of *Pacifica* to the facts now before us is buttressed by the Supreme Court's own treatment of *Pacifica.* Recent decisions of the Court have largely limited *Pacifica* to its facts. In *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), the Court pointed out that the majority in *Pacifica* had "emphasize[d] the narrowness of our holding" and the fact that broadcasting is "uniquely" pervasive and "uniquely" accessible to children. *Id.* 103 S.Ct. at 2884. *Bolger* involved a challenge to a federal statute prohibiting unsolicited mailing of contraceptive advertisements. The Court rejected the government's argument that the statute shielded recipients of mail from materials they are likely to find offensive, stating: "The First Amendment 'does not permit

the government to prohibit speech as intrusive unless the "captive" audience cannot avoid objectionable speech.'" *Id.* at 2883 (quoting *Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 542, 100 S.Ct. 2326, 2336, 65 L.Ed.2d 319 (1980)). The government also attempted to justify the statute as an aid to parents' efforts to control the manner in which their children become informed about sensitive and important subjects such as birth control. The Court, while recognizing that this interest was "undoubtedly substantial," found that the "marginal degree of protection ... achieved by purging all mailboxes of unsolicited material that is entirely suitable for adults ... is more extensive than the Constitution permits, for the government may not 'reduce the adult population ... to reading only what is fit for children.'" *Bolger,* 103 S.Ct. at 2884 (quoting *Butler v. Michigan,* 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412 (1957)). The Court distinguished the facts in *Pacifica,* finding the receipt of mail to be "far less intrusive and uncontrollable." *Bolger,* 103 S.Ct. at 2884.

Even if we were to find the rationale of *Pacifica* applicable to this case, we would still be compelled to strike the ordinance as facially overbroad. As the district judge noted, the ordinance "prohibits far too broadly the transmission of indecent materials through cable television. The ordinance's prohibition is wholesale, without regard to the time of day or other variables

---

**8.** Two members of the *Pacifica* majority gave more explicit recognition to the rights of willing adult listeners:

> It is argued that ... the Commission's holding in this case is impermissible because it prevents willing adults from listening to Carlin's monologue over the radio in the early afternoon hours. It is said that this ruling will have the effect of "reduc[ing] the adult population ... to [hearing] only what is fit for children." *Butler v. Michigan,* 352 US 380, 383, 1 L ed 2d 412, 77 S Ct 524 [526] (1957). This argument is not without force.... But it is not sufficiently strong to leave the Commission powerless to act in circumstances such as those in this case.

*Pacifica,* 438 U.S. at 760, 98 S.Ct. at 3046 (Powell, J., concurring).

**9.** Appellants and the State of Utah apparently argue that the limited number of stations on

cable television somehow gives the city an interest in regulating indecency on cable television. This argument, however, misconstrues the rationale in *Pacifica* and in other Supreme Court cases such as *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 396, 89 S.Ct. 1794, 1809, 23 L.Ed.2d 371 (1969). As Justice Brennan noted in *Pacifica:*

> The opinions of my Brothers Powell and Stevens rightly refrain from relying on the notion of "spectrum scarcity" to support their result. As Chief Judge Bazelon noted below, "although scarcity has justified *increasing* the diversity of speakers and speech, it has never been held to justify censorship."

*Pacifica,* 438 U.S. at 770 n. 4, 98 S.Ct. at 3051 n. 4 (Brennan, J., dissenting) (quoting *Pacifica Foundation v. FCC,* 556 F.2d 9, 29 (D.C.Cir. 1977)).

indispensable to the decision in *Pacifica*." *Cruz v. Ferre*, 571 F.Supp. at 131. The ordinance totally fails to account for the variables identified in *Pacifica*: the time of day; the context of the program in which the material appears; the composition of the viewing audience. In ignoring these variables, the ordinance goes far beyond the realm of permissible regulation envisioned by the *Pacifica* Court.

However noble may have been the city's intentions, we are constrained to recognize the limitations imposed by the Constitution and the opinions of the Supreme Court. The city's attempt through the challenged ordinance to regulate indecency on its cable television system exceeds these limitations.[10]

### DUE PROCESS

■ The district court also held that the procedures for the enforcement of the ordinance, found in section 3, violate "the fundamental notion of fairness implicit in due process." *Cruz v. Ferre*, 571 F.Supp. at 133. The court found that "concentrating the functions of complainant, jury, judge and 'executioner' in one person" created a "risk of arbitrary or capricious governmental action [which] under these circumstances is intolerably high." *Id.* The court recognized that the combination of investigative and adjudicative functions does not of itself amount to a due process violation. However, relying upon language in *Withrow v. Larkin*, 421 U.S. 35, 58, 95 S.Ct. 1456, 1470, 43 L.Ed.2d 712 (1975), to the effect that a court may determine that the facts before the court present an intolerably high risk of unfairness, the district court found such a risk to exist in the Miami ordinance, describing the determinations to be made under the ordinance as involving "an area of moral judgment that might well try the neutrality and impartiality of Solomon." *Cruz v. Ferre*, 571 F.Supp. at 133.

We find ourselves in agreement with the district judge. The ordinance involves sensitive judgments in areas of potentially great impact upon first amendment rights. The Supreme Court has often recognized that the regulation of a communicative activity must adhere to more narrowly drawn procedures than regulation of ordinary commercial activity. *See, e.g., Vance v. Universal Amusement Co.*, 445 U.S. 308, 315 & n. 12, 100 S.Ct. 1156, 1161 & n. 12, 63 L.Ed.2d 413 (1980). "[T]he Fourteenth Amendment requires that regulation by the States of obscenity conform to procedures that will ensure against the curtailment of constitutionally protected expression, which is often separated from obscenity only by a dim and uncertain line." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66, 83 S.Ct. 631, 637, 9 L.Ed.2d 584 (1963). "The separation of legitimate from illegitimate speech calls for ... sensitive tools." *Id.* Because of these considerations, the Court has required tools such as "a judicial determination in an adversary proceeding," *Freedman v. Maryland*, 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965), and a procedure for "prompt judicial review," *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 562, 95 S.Ct. 1239, 1248, 43 L.Ed.2d 448 (1975). While it would be inappropriate for us to determine at this time what procedures are necessary and appropriate under the ordinance, it is sufficient to note that the procedural guarantees presently provided in the ordinance are not sufficient to protect the vital interests at stake.

### CONCLUSION

For the reasons stated herein, we hold that the findings of the district court were correct as a matter of law.[11] Accordingly, we AFFIRM.

---

10. We note that broadcast stations which are also carried on Cablevision are still subject to the FCC's permissible *Pacifica* regulation. The district court noted that Cablevision's basic service consists of local and remote broadcast signals. *Cruz v. Ferre*, 571 F.Supp. at 128.

11. Because of our resolution of the issues in this appeal, we find it unnecessary to address the equal protection, prior restraint, and federal preemption issues raised by appellees and amici.